799 S.E.2d 295

**In the MATTER OF Melanie Anne EMERY, Respondent.**

**Appellate Case No. 2017-000608**
**Opinion No. 27712**

Supreme Court of South Carolina.

Submitted April 4, 2017
Filed April 19, 2017

Lesley M. Coggiola, Disciplinary Counsel, and Barbara M. Seymour, Deputy Disciplinary Counsel, both of Columbia, for Office of Disciplinary Counsel.

J. Steedley Bogan, Esquire, of Bogan Law Firm, of Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent (Agreement) pursuant to Rule 21 of the Rules for Lawyer Disciplinary Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court Rules (SCACR). In the Agreement, respondent admits misconduct and consents to the imposition of a public reprimand. She further agrees: 1) to pay the costs incurred in the investigation and prosecution of this matter within thirty (30) days of the imposition of discipline; 2) to complete the Legal Ethics and Practice Program Trust Account School within one (1) year of the imposition of discipline; and 3) to refund $2,995.00 to Client B, $2,995.00 to Client C, and $3,000.00 to Client E within ninety (90) days of the imposition of discipline. We accept the Agreement and issue a public reprimand with conditions as specified in the conclusion of this opinion. The facts, as set forth in the Agreement, are as follows.

## Facts

Respondent is licensed to practice law in South Carolina, New York, Maryland, and the District of Columbia. Prior to her admission in South Carolina in 2013, respondent was employed by three firms in other states, primarily conducting real estate closings. Since 2013, respondent has operated a solo practice, Emery Law, from an office in Myrtle Beach. Respondent also maintained office space for Emery Law in New York, but she performed little work there. Emery Law had no non-lawyer employees, but was, instead, staffed by contract paralegals employed by Precision Paralegal, a non-lawyer-owned company. Emery Law also used the support services of First Legal Net, a non-lawyer-owned company contracted through Precision Paralegals. During the times relevant to this Agreement, respondent had no partners or associates at Emery Law. Her practice in South Carolina has consisted of residential and commercial real estate closings and mortgage loan modification matters.

## Matter I

During the time relevant to these complaints, respondent operated a website for Emery Law. Respondent admits that she retained a website professional to prepare the content of her website without discussing the Rules of Professional Conduct with him or reviewing the website before it was disseminated. The website professional developed the website content by cutting and pasting from other law firm websites which resulted in a number of inaccurate representations and improper statements.

Respondent acknowledges the following errors on her law firm website:

1. the website referred to "attorneys" and "lawyers" when in fact respondent was the only attorney at Emery Law;

2. the website claimed "over 12 years of experience" and "fifteen years combined experience" in reference to respondent. Although respondent had been admitted to practice for twelve years, she had only practiced law for about eight years prior to becoming admitted in South Carolina;

3. the website included a form of the word "expert," although respondent was not a certified specialist; and

4. the website advertised for "wrongful foreclosure lawsuits" when respondent had no experience in, or intention to accept, cases related to litigation.

## Matter II

Respondent maintained a law firm profile on www.facebook.com. Both respondent and a paralegal employed through Precision Paralegal created content for the Facebook page. Respondent did not adequately monitor the posts made by the contract paralegal. Respondent acknowledges the following errors on her Facebook page:

1. the paralegal created Facebook posts congratulating respondent's clients after each real estate closing. Respondent did not have her clients' permission to post their names and other information about their legal matters on Facebook.

2. the paralegal included unsubstantiated comparative descriptions of respondent and her legal services such as "best;" and

3. the paralegal advertised special discounted rates for respondent's legal fees without disclosing whether or not those rates included anticipated costs.

## Matter III

In 2013, respondent signed a contract with Friedman Law, a New York law firm, to accept referrals of mortgage loan modification cases. In connection with her association with Friedman Law, respondent received client referrals from an internet marketing company. Respondent paid for this service based on the number of potential clients referred to her, not based on the number of referred clients who ultimately hired her. Respondent charged her clients a "flat" fee for loan modification cases.

In this marketing campaign, advertisements were placed on the internet with a link to respondent's website. A potential client would access the website and complete an online questionnaire. Regardless of the residence of the potential client or the location of the property, the case would be assigned to

Emery Law as part of the Friedman Law network. A non-lawyer employee of the internet marketing company or Friedman Law would review the completed questionnaire, send a solicitation or introduction email to the potential client, and conduct an initial telephone consultation with the potential client. That contact would include discussing the scope of the representation and fees, and providing the client with the fee agreement and electronic payment authorization forms on Emery Law letterhead. Once the forms were signed and initial payment received, the client's information would be sent to non-lawyers working on behalf of Emery Law employed by Friedman Law, Precision Paralegal, or First Legal Net.

Upon receipt of client information, a non-lawyer employee of Friedman Law, Precision Paralegal, or First Legal Net would contact the client by telephone for a "quality control interview" to ensure that the client qualified for a loan modification. These non-lawyers would then set up the file and contact the client to complete necessary forms, request financial loan documentation, and schedule a telephone conference with a representative of the lender. In their communications with respondent's clients and potential clients, the non-lawyers included Emery Law in their signature blocks and used documents with Emery Law letterhead.

In connection with her association with Friedman Law, respondent accepted cases in states where she is not licensed to practice law. Six of those clients filed disciplinary complaints. Other than some of the Precision Paralegal employees who physically worked in her office, respondent had no direct supervision of the non-lawyers who worked on these clients' cases. Respondent was rarely copied on emails between the non-lawyers and these clients or internal emails among the non-lawyers. Respondent supervised their work by reviewing their notes, documents, and some emails on a shared electronic case management system.

Review of these clients' files reveals that, for the most part, the non-lawyers worked diligently to try to secure modifications of the mortgage loans and adequately communicated with the clients. In each of these cases, however, some issue or complication resulted in the client's dissatisfaction and, ultimately, the disciplinary complaints. Respondent had no per-

sonal, direct communication with these clients during their representation except when the cases reached the point at which the clients complained about her services or demanded refunds of their fees.

With regard to the conduct of the non-lawyers working on her behalf in these cases, respondent admits the following misconduct:

1. the non-lawyers presented the fee agreement and discussed the scope of the representation and the fee structure to the clients before respondent reviewed the file and accepted the cases. The written fee agreement was confusing and self-contradictory; it also contradicted statements made to the clients by some of the non-lawyers and subsequent emails and documents sent to the clients, particularly with regard to available legal services, fee refunds, and termination of the representation;

2. when issues arose about how the clients' cases were progressing, the non-lawyers discussed those issues and made decisions amongst themselves then advised the clients without respondent's input;

3. the non-lawyers negotiated the terms of loan modifications with lender representatives, sought continuances or stays of sales of properties from lenders' counsel and courts, and otherwise provided legal services to the clients without review or additional effort by respondent. In one case, a non-lawyer (referred to as a "bankruptcy specialist") assisted a client in preparing a *pro se* bankruptcy petition and advised her about filing procedures. The petition filed by the client was deficient and did not meet the requirements of the Bankruptcy Court. In another case, a non-lawyer advised the client to stop making mortgage payments during the modification negotiations (in spite of the client's ability to do so and the risk of foreclosure), contrary to respondent's customary advice to similarly situated clients; and

4. in email messages and telephone calls, the non-lawyers held themselves out as employees of Emery Law when, in fact, none of them were Emery Law employees, only a few physically worked in respondent's office, and most

did not even work in South Carolina. At any given time, the clients did not know if they were communicating with an employee of Emery Law, Friedman Law, Precision Paralegal, First Legal Net, or an associated firm in the Friedman Law network.

## Matter IV

Respondent relied on representations from Friedman Law that assisting a client in negotiating a mortgage loan modification was not the practice of law and that Friedman Law's network of attorneys in other states satisfied the requirements for multijurisdictional practice. Respondent admits the following with regard to her arrangements with Friedman Law:

1. assisting clients in loan modification matters is the practice of law in South Carolina when performed by a lawyer;

2. simply associating with a licensed attorney in another state might not be sufficient to avoid the unauthorized practice of law, depending on the rules and laws in place in that state;

3. she did not research the law in the states from which she accepted cases to determine the appropriateness of representing residents of those states; and

4. regardless of whether or not a particular state has adopted a rule permitting multijurisdictional practice and regardless of whether or not a particular state has determined that loan modification assistance is the practice of law, respondent's fee agreement specifically and repeatedly refers to her firm's services as "legal services" and to herself as "Attorney." Respondent admits that her clients reasonably believed that they were retaining an attorney at a law firm to provide them with legal services and that they would be afforded the protections of an ethical code specific to the legal profession.

## Matter V

Client A is a resident of the State of Washington. Client A hired respondent to represent her in an attempt to modify the terms of a mortgage loan on residential property located in

Washington. Client A agreed to a flat fee of $2,995.00, and made a payment of $1,500.00 towards that fee. Respondent was not licensed to practice law in Washington and did not disclose to Client A that she was not licensed to practice law in that state. Client A terminated respondent's services prior to modification of the loan and sought the assistance of an attorney licensed in Washington. Respondent ultimately refunded fees paid by Client A and signed an agreement with Washington authorities that she will no longer perform services in that state.

Respondent admits the following misconduct with regard to her representation of Client A:

1. the loan modification services provided by her in Washington in connection with her law practice was subject to the Washington Rules of Professional Conduct;

2. her representation of Client A was part of a systematic and continuous presence in Washington and constituted the unauthorized practice of law in violation of Washington's Rules of Professional Conduct Rule 5.5(b);

3. funds were drawn on Client A's bank account through an authorized electronic transfer and paid directly into respondent's operating account prior to Client A signing the fee agreement and before those funds were earned. Washington Rules of Professional Conduct Rule 1.15A(c)(2) requires that fees paid in advance be held in trust until earned unless certain disclosures are made in a written fee contract. Respondent did not include those disclosures in Client A's fee contract and, therefore, she was not entitled to deposit the funds directly into her operating account; and

4. respondent's failure to adequately supervise the work of non-lawyers on Client A's case violated Washington Rules of Professional Conduct Rule 5.3(a).

## Matter VI

Mr. and Mrs. B (Client B) are residents of the State of Wisconsin. Client B hired respondent to attempt to modify the terms of a mortgage loan on residential property located in Wisconsin. Client B paid respondent a flat fee of $2,995.00 through a series of electronic funds transfers. Ultimately,

Client B terminated respondent's services before obtaining a loan modification.

Respondent was not licensed to practice law in Wisconsin. She did not disclose to Client B that she was not licensed to practice law in Wisconsin.

Respondent admits the following misconduct with regard to her representation of Client B:

1. her representation of Client B was part of a systematic and continuous presence in Wisconsin and, as such, was the unauthorized practice of law in violation of Wisconsin Supreme Court Rule 20.5.5(b)(1); and

2. funds were drawn on Client B's bank account through an authorized electronic transfer and paid directly into respondent's operating account before the funds were earned. Wisconsin Supreme Court Rule 20.1.15 requires that fees paid in advance are to be held in trust until earned unless certain disclosures are made in a written fee contract. Respondent did not include those disclosures in Client B's fee contract and, therefore, she was not entitled to deposit the funds directly into her trust account.

## Matter VII

Client C is a resident of the State of Pennsylvania. Client C hired respondent to represent her in an attempt to modify the terms of a mortgage loan on residential property located in Pennsylvania. Client C paid a flat fee of $2,995.00 through a series of electronic funds transfers. Respondent was not licensed to practice law in Pennsylvania. Respondent terminated the representation prior to modification of the loan because Client C filed a disciplinary complaint.

Respondent admits the following misconduct with regard to her representation of Client C:

1. the loan modification services provided by respondent in Pennsylvania in connection with her law practice was subject to the Pennsylvania Rules of Professional Conduct, 204 Pa. Code § 81.4 pursuant to Rule 5.7;

2. her representation of Client C was part of a systematic and continuous presence in Pennsylvania and, as such,

was the unauthorized practice of law in violation of Rule 5.5(b) of the Pennsylvania Rules of Professional Conduct;

3. funds were drawn on Client C's bank account through an authorized electronic transfer and paid directly into respondent's operating account before those funds were earned. Rule 1.15(i) of the Pennsylvania Rules of Professional Conduct requires that fees paid in advance be held in trust until earned unless the client gives informed consent, confirmed in writing, to the handling of fees in a different manner. Respondent did not obtain Client C's informed consent, confirmed in writing. Therefore, respondent was not entitled to deposit the funds directly into her operating account; and

4. her failure to adequately supervise the work of non-lawyers on Client C's case violated Rule 5.3(a) of the Pennsylvania Rules of Professional Conduct.

## Matter VIII

Client D is a resident of the State of Texas. Client D hired respondent to represent him in an attempt to modify the terms of a mortgage loan on residential property located in Texas. Client D agreed to a flat fee of $2,995.00 and paid a total of $2,250.00 by cashier's checks. Respondent was not licensed to practice law in Texas, and she did not disclose to Client D that she was not licensed to practice law in that state. Client D terminated the representation prior to modification of the loan because of his concerns over the progress of the case. Respondent has refunded his fees.

Respondent admits the following misconduct with regard to her representation of Client D:

1. based on representations made in her written fee contract, the loan modification services provided by respondent in Texas in connection with her law practice were legal services subject to the Texas Disciplinary Rules of Professional Conduct.

2. respondent's representation of Client D was the unauthorized practice of law in violation of Rule 5.05(a) of the Texas Disciplinary Rules of Professional Conduct;

508

3. the cashier's checks submitted by Client D were deposited into respondent's operating account before the funds were earned. Rule 1.14(c) of the Texas Rules of Professional Conduct requires that fees paid in advance be held in trust until earned,[1] therefore, respondent was not entitled to deposit the funds directly into her operating account; and

4. respondent's failure to adequately supervise the work of non-lawyers on Client D's case violated Rule 5.03(a) of the Texas Disciplinary Rules of Professional Conduct.

## Matter IX

Mr. and Mrs. E (Client E) are residents of the State of Utah. Client E hired respondent to modify the terms of a mortgage loan on residential property located in Utah. Client E agreed to a flat fee of $3,000.00 which was paid through a series of electronic funds transfers. Respondent was not licensed to practice law in Utah. Respondent did not disclose to Client E that she was not licensed to practice law in Utah. Client E terminated the representation prior to modification of the loan because of concerns over the progress of the case.

Respondent admits the following misconduct with regard to her representation of Client E:

1. the loan modification services provided by respondent in Utah in connection with her law practice was subject to the Utah Rules of Professional Conduct pursuant to Rule 5.7(b) of those rules;

2. her representation of Client E was part of a systematic and continuous presence in Utah and, as such, was the unauthorized practice of law in violation of Rule 5.5(b) of the Utah Rules of Professional Conduct;

3. funds were drawn on Client E's bank account through authorized electronic transfers and paid directly into respondent's operating account before those fees were earned. Rule 1.15(c) of the Utah Rules of Professional Conduct requires that fees paid in advance be held in trust until earned, therefore, respondent was not enti-

---

1. *See* Comment 2 to Rule 1.14(c) of the Texas Rules of Professional Conduct.

tled to deposit the funds directly into her operating account; and

4. her failure to adequately supervise the work of non-lawyers on Client E's case violated Rule 5.3(a) of the Utah Rules of Professional Conduct.

## Matter X

Client F is a resident of the State of Illinois. Client F hired respondent to represent her in an attempt to modify the terms of a mortgage loan on residential property located in Illinois. Client F agreed to a flat fee of $2,995.00 which was paid with a series of electronic funds transfers. Respondent was not licensed to practice law in Illinois. Respondent did not disclose to Client F that she was not licensed to practice law in Illinois. Client F terminated the representation prior to modification of the loan. Respondent entered into a settlement agreement to refund $1,300.00 of the fees paid. Client F filed a disciplinary complaint with the disciplinary authority in Illinois which then referred the matter to the Commission on Lawyer Conduct (the Commission). Ultimately, respondent refunded Client F the full amount of the fees paid.

Respondent admits the following misconduct with regard to her representation of Client F:

1. based on representations set forth in her fee agreement, the loan modification services provided by respondent in Illinois in connection with her law practice were legal services subject to the Illinois Rules of Professional Conduct;

2. her representation of Client F was part of a systematic and continuous presence in Illinois and, as such, was the unauthorized practice of law in violation of Rule 5.5(b) of the Illinois Rules of Professional Conduct;

3. funds were drawn on Client F's bank account through an authorized electronic transfer and paid directly into respondent's operating account before the fees were earned. Rule 1.15(c) of the Illinois Rules of Professional Conduct requires fees paid in advance be held in trust until earned unless certain disclosures are made in a written fee contract. Respondent did not include those disclosures in Client F's fee contract and, therefore, was

not entitled to deposit the funds directly into her operating account;

4. her failure to adequately supervise the work of non-lawyers on Client F's case violated Rule 5.3(a) of the Illinois Rules of Professional Conduct; and

5. in entering into a settlement agreement with Client F, respondent prospectively limited her liability to Client F without the involvement of, or the advice to seek the advice of independent counsel, in violation of Rule 1.8(h) of the Illinois Rules of Professional Conduct.

## Matter XI

Respondent represented Apex Homes and its sole shareholder (LW) in real estate matters. In August 2015, LW retained respondent to file a collection action in South Carolina on behalf of Apex against US Development Company, LLC (US Development) on a promissory note guaranteed by three individuals (DB, TP, and JP) (referred to as the Collection Action).

Respondent attempted service on US Development and the three guarantors, all named as defendants in the Collection Action. Robert Lewis, Esquire, contacted respondent and advised her he would be representing US Development, TP, and JP in the Collection Action. Mr. Lewis also advised respondent that he would not be representing DB nor would he accept service on his behalf.

Respondent was unable to perfect service on DB. On January 27, 2016, respondent filed a Motion for Order of Publication which was granted. DB did not file an answer. In June 2016, respondent filed a Motion for Default against DB. A hearing was held in which DB (through counsel) argued that DB should be permitted to file a late answer because respondent did not serve Mr. Lewis (as counsel for the other three defendants) with the Motion for Order of Publication.

Following the hearing on the Motion for Default, Mr. Lewis and DB's counsel requested respondent provide proof of service of the Motion for Order of Publication and proposed order on Mr. Lewis. Respondent produced a copy of a cover letter to the clerk of court showing a carbon copy ("cc") to Mr. Lewis. An examination of the clerk of court's file showed that the

copy of the cover letter was not the same as the one actually sent to the clerk of court. The letter in the clerk's file did not show a "cc" to Mr. Lewis and differed in a number of other significant ways from the copy. Respondent also produced a copy of an affidavit of her paralegal attesting that she had served Mr. Lewis with the Motion and proposed order. The affidavit of service was not filed with the clerk of court.

Respondent informed the court that it was the practice of her paralegal to add a "cc:" reference to a copy of a cover letter, then to serve the amended copy along with an affidavit of service on the parties listed in the "cc:" reference. Respondent further asserts that, in the case of the Motion for Order by Publication and proposed order in the Collection Action, her paralegal misplaced the copy and, therefore, recreated the cover letter and added the "cc:" reference, thus accounting for the inconsistencies between the original in the clerk's file and the copy. Mr. Lewis reviewed the clerk of court's file and found respondent's cover letters for the Order of Publication, Affidavit of Publication, affidavits of service and of nonservice, a Motion for Summary Judgment and a Motion for Protective Order. The original cover letters for these documents do not have "cc:" references indicating that Mr. Lewis was served.

In her order denying the Motion for Default Judgment, the judge found that respondent "did not serve Robert Lewis—who represented the other Defendants in the suit—with the Motion for Order of Publication. The failure to serve the co-defendants seems to be a result of a break down in office procedures, and was not the result of willful actions on behalf of [respondent]. However, the [clerk of court's] file corroborates Lewis's contention that he was not served with the motion and other pertinent documents."

Respondent asserts her paralegal followed the practice set forth above with the other documents as well. That is, she made copies of the cover letters and added the "cc:" references to them before she served them on Mr. Lewis. Respondent acknowledges that this practice makes it difficult for her to establish that she actually served Mr. Lewis with the documents. She also acknowledges that showing a copy to opposing counsel on a motion allows the judge to ensure compliance with Canon 3(B)(7) of the Code of Judicial Con-

duct, Rule 501, SCACR. Respondent has now put in place a better procedure in her office to ensure that service of motions and other papers is properly documented.

## Matter XII

In March 2016, respondent filed a defamation action in South Carolina on behalf of LW and Apex against US Development, TP, JP, Mr. Lewis, and Mr. Lewis's law firm (referred to as the Defamation Action). The alleged defamatory statements were made in connection with a Department of Labor, Licensing, and Regulation complaint defendants filed against an appraiser involved in the transaction underlying the Collection Action.

After she filed the Defamation Action Summons and Complaint, but before she attempted service, respondent issued third party subpoenas for documents she believed would support her clients' defamation claims. She did not serve Mr. Lewis or any of the other Defamation Action defendants with copies of the subpoenas. Ultimately, respondent was unable to obtain documents to support those claims so she dismissed the Defamation Action with prejudice. Respondent mistakenly believed that she did not have to serve the defendants with copies of the subpoenas as they had not yet been served with the Defamation Action Summons and Complaint. Respondent now recognizes that Rule 45(b)(1) of the South Carolina Rules of Civil Procedure (SCRCP) requires that she serve notice and a copy of a third-party subpoena to all parties to an action. She further acknowledges that it was improper to issue subpoenas prior to service of the Defamation Action Summons and Complaint and that the proper procedure for obtaining the information she sought would have been to file a petition pursuant to Rule 27(a), SCRCP.

## Law

Respondent admits that by her conduct she has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation); Rule 1.6 (lawyer shall not reveal information relating to representation of client unless client gives informed consent); Rule 5.3(a) (with respect to non-lawyer employed by lawyer, lawyer shall make reasonable efforts to ensure that

firm has in effect measures giving reasonable assurance that person's conduct is compatible with professional obligations of lawyer); Rule 5.5(a) (lawyer shall not practice law in jurisdiction in violation of regulation of law in that jurisdiction); Rule 5.7 (lawyer shall be subject to Rules of Professional Conduct with respect to provision of law related services); Rule 7.1(a) (lawyer shall not make false, misleading, or deceptive communications about lawyer or lawyer's services; communication violates rule if it contains material misrepresentation of fact or omits fact necessary to make statement considered as whole not materially misleading); Rule 7.1(c) (lawyer shall not make false, misleading, or deceptive communications about lawyer or lawyer's services; communication violates rule if it compares lawyer's services with other lawyers' services, unless comparison can be factually substantiated); Rule 7.2(g) (lawyer who advertises specific fee or range of fees for particular service shall honor advertised fee or fee range for at least ninety (90) days following dissemination of advertisement, unless advertisement specifies shorter period; provided fee advertised in publication issued not more than annually, shall be honored for one (1) year following publication); Rule 7.4(b) (lawyer who is not certified specialist may not use word or form of words "certified," "specialist," "expert," or "authority" in advertisement); Rule 7.5(d) (lawyer may state or imply lawyer practices in partnership or other organization only when that is fact); Rule 8.4(e) (it is professional misconduct for lawyer to engage in conduct prejudicial to administration of justice); and Rule 8.5(c) (lawyer giving advice or providing services that would be considered practice of law if provided while lawyer affiliated with law firm is subject to Rules of Professional Conduct with respect to giving of such advice or providing of such services whether or not lawyer actively engaged in practice of law or affiliated with law firm; in giving such advice and in providing such services, lawyer shall be considered to be representing client for purposes of Rules of Professional Conduct.).

Respondent also admits she has violated the following Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR: Rule 7(a)(1) (it shall be ground for discipline for lawyer to violate Rules of Professional Conduct).

## Conclusion

We find respondent's misconduct warrants a public reprimand. Accordingly, we accept the Agreement and publicly reprimand respondent for her misconduct. In addition, respondent shall: 1) pay the costs incurred in the investigation and prosecution of this matter by ODC and the Commission no later than thirty (30) days from the date of this opinion and 2) provide proof of completion of the Legal Ethics and Practice Program Trust Account School to the Commission no later than one (1) year from the date of this opinion. Further, within ninety (90) days of the date of this opinion, respondent shall refund $2,995.00 to Client B, $2,995.00 to Client C, and $3,000 to Client E.

**PUBLIC REPRIMAND.**

BEATTY, C.J., KITTREDGE, HEARN, FEW and JAMES, JJ., concur.